Robert TEBEAU (Claimant), Appellant,

v.

BADEN EQUIPMENT and CONSTRUC-
TION COMPANY (Employer),

and

Aetna Casualty and Surety Company
(Insurer),
(Defendants), Respondents.

No. 29536.

St. Louis Court of Appeals.

Missouri.

Nov. 7, 1956.

Ray Carleno, Carleno & Nick, Ferguson, for appellant.

Luke, Cunliff & Wilson, St. Louis, for respondents.

ANDERSON, Presiding Judge.

This is an appeal from a judgment of the Circuit Court affirming a final award of the Industrial Commission in a proceeding under the Missouri Workmen's Compensation Act, Section 287.010 et seq. RSMo 1949, V.A.M.S. Claimant-appellant is Robert Tebeau. The respondents are Baden Equipment and Construction Company, employer, and its insurance carrier, Aetna Casualty and Surety Company. The award was for temporary total disability in the sum of $35 per week for 2⅗ weeks, plus $72.25 for medical aid. Claimant contends that the Commission could not reasonably have made such finding, and that under the overwhelming weight of the evidence he was entitled to an award of permanent partial disability of the whole man in the amount of twenty-five per cent.

Claimant had worked for Baden Equipment and Construction Company, the respondent, for the last fourteen years prior to July 12, 1954. During that time he had suffered no accident or illness, and was generally considered to be in good health.

On July 12, 1954, claimant reported for work at approximately 8:00 a. m. He felt "fine" at the time. His first assignment of work that morning was the delivery of tanks to Bissell Hills in St. Louis County. After doing this, he reported for work at a gasoline bulk plant in St. Charles, Missouri, to assist in dismantling certain gasoline storage tanks. He arrived there with his truck around ten o'clock or a little later. It was a warm day. By noon the temperature at Lambert Field in St. Louis County had reached 104 degrees. There was certain preliminary work to be done before the particular tank the men were working on could be removed. This work consisted of removing the pipes connected to the tank. In doing this claimant worked in the sun. The next step in work, after disconnecting the pipes, was to load the tank on a truck. Claimant's duties in connection with this procedure required him to remain in the cab of his truck and keep the engine of the truck going. The tank was in some manner lowered onto the truck. This stage of the proceeding was reached at about 3:00 p. m. At that time the temperature at Lambert Field had reached 109 degrees. It was agreed by the parties that the temperature at St. Charles was approximately the same as at Lambert Field. It was necessary to keep the doors of the truck closed during this operation for the reason that the front end of the truck would be elevated when the tank would fall onto the truck. Keeping the doors closed would keep the operator from being thrown from the truck. There was no mat on the floor of the cab. The floor was full of cracks and holes. At the time claimant backed his truck into position, to take on the tank, he was sweating profusely, but felt good. The process of getting the tank onto the truck took about twenty or twenty-five minutes.

After the tank was completely loaded claimant started getting sick. He became dizzy and nauseated. He got out of the truck and remarked to Kenneth Dantin, a fellow employee, "God damn it, it's hot in there." The tank was then tied down onto the truck, after which claimant got back into the cab and drove the truck about 150 feet when the tank was unloaded. He then backed the truck to the next tank to be dismantled. He again became ill. He started to walk to a shady place and fell. He became unconscious. When he regained conciousness he complained of being dizzy and nauseated. He had a headache and cramps or muscle spasms, which he called "knots" in his leg and back. His color was greyish-green. Claimant was taken to a hospital in St. Charles and then to his home. While on the way home he again became ill. He stated: "Well, I got sick twice on the way going home, and once he stopped and went in and got me a glass of water. Then I got sick again. * * * I felt like I wanted to vomit and I had pains in my head and I started getting those knots back again. * * * When I got home I sat in a chair and they had the fan going, and that is when I thought I was going, because I got the knots again."

During the night claimant again suffered cramps, and the next morning he was still feeling ill. This condition continued and, on July 17, five days after he was stricken, claimant went to see Dr. Johnson, a physician in Ferguson. He complained of dizziness and pain in the head, the same type of thing he had on July 12th. He stated that Dr. Johnson examined him and gave him some medicine. Thereafter, he went to Dr. Johnson every Saturday. He stated: "When I take medicine, some of his medicine makes me feel better. Then I get sick again. I have been going to work sick every day."

Claimant started to go to work on July 26, but on the way became ill. He stated: "I pulled off to the side of the road and I sat there a few minutes and then I contin-

ued on to work, and when I got to work I drank a coke * * * and I got sick again and I was white and pale * * * that is what the fellows told me, and I went around the side of the building and I started vomiting, and Kenney said, 'You ain't going to work, you can't work', and he got Dell Miller, another man who was putting bulk tanks up, for him to take me home again." Claimant stated he was ill all that day, with vomiting and dizziness.

On August 2, 1954, claimant went to the office of the Baden Equipment and Construction Company and told his boss that he was quitting his job. When asked why he was quitting he replied: "I am getting away from heavy work * * * I am going to get a job for the City of Florissant." At that time claimant had already secured employment with the City of Florissant. Claimant started to work for the City of Florissant on August 4, 1954, at a salary of $300 per month. His work consisted of driving a truck, cutting weeds, reading meters, fixing signs, painting fire plugs, and any other work required around the City Hall. He stated that his job with the City did not require heavy lifting. When asked how he had been feeling since going to work for the City, claimant replied: "Well, I go to work sick half the time * * * sick to my stomach. I have headaches. I have a headache right now. I can hardly see. * * * I am still sick. I go to work sick sometimes in the morning. * * * I feel like I am going to vomit, and I have pains here (indicating)."

Dr. Roy Johnson testified on behalf of claimant. He first examined claimant at his office on July 17, 1954. At that time claimant complained of dizziness, ringing in the ears, and muscular cramps. The outward symptoms were: "he looked washed out. He looked exhausted. Of course, his dizziness and muscular cramps and such things is more or less subjective. * * * his blood pressure was a little lower than normal. * * * After examining him and taking the history into considera-

tion, I came to the conclusion he had heat exhaustion, quite a marked case of heat exhaustion."

Dr. Johnson next saw claimant on July 21, 1954. Claimant's symptoms on that date were nausea, dizziness and extreme muscular weakness. The doctor's findings "were essentially like those on the 17th." Claimant's next visit to the doctor was on July 26, 1954. At that time claimant was suffering from severe pain in the back of the head, in the occipital region, and periodic muscular cramps and vomiting. On August 28, 1954, claimant had about the same symptoms except they were not as severe as before. He was improving. On a visit to the doctor on September 4, 1954, claimant complained of pain in the left side of the head, tiredness and dizziness, and inability to sleep. The same complaints were made on September 11, 1954. The next visit to the doctor's office was on October 16th. Claimant was "still complaining of dizziness and pain in the back of his head and exhaustion, and he was back to the office again on October 25th. He always came in and complained of dizziness and weakness and nervousness. The last time claimant visited Dr. Johnson's office was December 29th when he was treated for a severe attack of lumbago. At that time claimant was still complaining of dizziness and nervousness. The doctor stated: "He seemed to be emotionally unstable, pain in the back of his head. * * * I think it was a syndrome, a nervous syndrome following the heat exhaustion. That is, generally speaking. I am not taking into consideration the lumbago attack he had. I don't think that had anything to do with the heat exhaustion." The doctor testified that claimant definitely had a case of heat exhaustion, the effects of which continued through the last visit. The doctor then stated:

"He has progressively gotten better. At the beginning he wasn't able to get out of bed hardly. He was so exhausted. He has progressively gotten better all the time, but following heat exhaustion * * * they have a nervous syndrome following it. They are emotionally unstable, and he has these pressure headaches and pain headaches, and especially complains a lot of pain in the occipital region and back of the neck, * * * and he still complains of being dizzy, and, in my opinion, it is the effects of the heat exhaustion that he had the previous July. * * * He still complains of that condition and it has been quite a little time since July 18th, 17th or 18th, and if he has complained of it this length of time it is reasonable to assume he may continue. * * * Just the length of time, that is problematical.

"Q. Doctor, would you say that this type of illness resulting from heat exhaustion has disabled Mr. Tebeau? A. Yes, sir, I think it has. Those cases that have a marked heat exhaustion to the point where they pass out, they lose consciousness, they don't seem to ever be able to withstand heat. In summertime, when it gets hot, they will tell you they can't take it, and, in my opinion, he will be incapacitated at least twenty-five per cent. * * * I mean twenty-five per cent of his being able to earn a livelihood from his work."

On August 12, 1954, Dr. Johnson signed and sent a report on claimant to the insurance carrier, Aetna Casualty and Surety Company. In this report, in answer to the printed question: "Date discharged as cured," appears the typewritten answer: "July 26". There also appears in said report the following question and answer: "Date able to return to previous work, Aug. 2, 1954."

On August 12, 1954, Dr. Johnson signed a report made out on a standard form issued by the Division of Workmen's Compensation. In said report appears the answer: "Aug. 2, 1954" to the question calling for the date the patient was able to resume regular work. The word "No" is typewrit-

ten in the blank space opposite the question: "Is further treatment needed?" When confronted with these reports on cross-examination, the doctor stated that they were made out by his secretary under his direction, but that he did not read the reports before signing them. He further stated that he did not have time to read such reports because he had hundreds of them. He said: "I told him to go back and continue work. It was my advice to him to return. If he couldn't continue to work, that is something else again. I try to get them back on the job as quickly as I possibly can in those cases." Dr. Johnson further testified:

"He is much improved. The future of his condition is more or less problematical. You just can't pinpoint it on how long he is going to be bothered with this. It may clear up or it may be permanent. Time will tell.

"Q. * * * and you can't decide that or give a firm opinion on that now? A. That's right.

"Q. He has improved and it is reasonable to expect he will continue to improve? A. It is reasonable to expect he will.

"Q. Your previous opinion concerning disability in this individual, I think you said twenty-five per cent. Is that an opinion as to what you think it is now on the present condition? A. Yes, sir.

"Q. What it may be in the future— A. That is problematical.

"Q. It may go away entirely and, of course, there will be no disability? A. That's right. * * * I don't think it will become any worse. It may be drawn out and may be more or less permanent, but I don't think it is reasonable to assume it will get worse."

Dr. Ernest H. Parsons testified on behalf of respondents. He examined claimant on October 9, 1954, and November 12, 1954.

He testified that the claimant's complaints primarily related to dizziness upon motion, pains in the back, pains in the left side of the head and neck, and muscle spasms. He made a general physical examination. He stated that this examination showed "some flattening of the lumbar lordotic curve which would normally be present, but he was able to bend his back fairly well. There was some limitation of motion. He had some subjective soreness over the paravertebral muscles below the level of the fourth dorsal spine. The patient had at that time no muscle spasm or any knots, as he had previously described. I found no atrophy of the muscles. * * * The neurological examination which was part of the physical examination showed the patient generally to have no organic pathology of the nervous system that I was able to elicit. The reflexes were intact. He had none of the findings which he had complained of in his chief complaint. The dizziness, for example, was not reflected in any abnormal extraocular movements, which would be true if there were true vertigo. There was no evidence of any impairment in the sense of balance or in past-pointing, so that the complaint of dizziness is a subjective complaint and I was unable to find any evidence, objective evidence of such a complaint. * * * The Rhomberg test was negative, that is to say, it was normal. * * * I had X-rays made of the thoracic spine. He had some subjective soreness of the thoracic and dorsal spine, and I had X-rays made of the lumbar spine and of the skull, also the cervical spine. * * * They showed a great deal of arthritis, degenerative process involving all portions of the spine, somewhat more marked in the cervical region than elsewhere, but present in all portions."

The doctor had made an electroencephalogram which showed no evidence of any impairment of the brain. A spinal puncture was made because of the claimant's repeated complaints. This proceeding disclosed normal pressure with normal fluid throughout. No abnormalities were elicited. Dr. Parsons further testified:

"Having the laboratory data and the observation of repeated examinations of the man, I then re-examined him on November 12th and found that the soreness in the left upper cervical region overlay the nerve roots that supply the occipital nerve, the greater occipital nerve on the left, and there was an area of decreased sensation over the distribution of this, and I concluded that the pain and headache in the region and in the back of the neck which the man had was related really to an irritation of the nerve root involving the left greater occipital nerve.

"Q. What was it that was irritating this nerve root, doctor? A. The changes in the cervical spine, the osteoarthritis, which is a degenerative process, in the cervical spine. * * * My conclusions were, sir, he had a neuritis of the left greater occipital nerve which was secondary to the osteoarthritis of the cervical spine. I also concluded, sir, there was no evidence which I could elicit of this man having had a heat stroke in July, 1954, and interpreting the history as one got it from him, at most, there was a mild salt depletion which might have produced the muscle knots as he described it. This is a transitory, reversible process and certainly has left no residuals in this case. The man's symptoms can, I think, be purely applied on the basis of osteoarthritic process of the cervical spine."

The witness further testified that claimant had sustained no permanent disability from the illness he had in July, 1954, and did not need or require any treatment for any condition caused by the heat exhaustion which occurred in July. He further testified that claimant had no limitation in his ability to work that could be attributable to the illness of July, 1954.

It appears that Dr. Parsons used certain notes to refresh his recollection while testifying concerning his October 9th examination of claimant. On cross-examination it was brought out that some of these notes were in the handwriting of the doctor's secretary and some in the handwriting of his assistant, Mr. Swartz. The doctor stated, however, that during his examination of claimant he himself verified all the information contained in the notes prepared by others. Thereafter, claimant took the stand and testified that Dr. Parsons did not examine him on October 9th.

The question here presented is whether the findings and award of the Industrial Commission are supported by competent and substantial evidence upon the whole record. Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55; Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647. In reaching a decision on said issue we may not substitute our own judgment for that of the commission, but must affirm unless it clearly appears from the whole record that the commission could not reasonably have made said finding and award. Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Karch v. Empire District Electric Co., 358 Mo. 1062, 218 S.W.2d 765.

It is also a well established principle that where the right to compensation depends upon the acceptance of one of two conflicting medical theories, the issue is one of fact for the Industrial Commission, whose finding cannot be disturbed unless the commission acted unreasonably by accepting and basing its decision on evidence which was not competent or substantial, or decided the issue contrary to the overwhelming weight of the evidence. Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657; Sams v. Hayes Adhesive Co., Mo.App., 260 S.W.2d 815; Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647.

Claimant presented testimony which, had it been accepted by the commission, would have supported the award in claimant's favor. It appears from his testimony

that the symptoms which developed as a result of the incident of July 12, 1954, persisted until the date of the hearing. Dr. Johnson, by his testimony, connected these complaints with the accident, and testified that claimant was incapacitated to the extent of twenty-five per cent of the man as a whole. On the other hand, respondents produced testimony which, if believed, warranted a finding that claimant's disability did not extend beyond the date he went to work for the City of Florissant. Dr. Parsons attributed claimant's principal complaints, that is, pain in the back of the neck and headaches, to an irritation of the occipital nerve root caused by osteoarthritis of the cervical spine. The doctor could find no objective evidence of the claimant's complaints of dizziness and muscle spasms. His conclusion was that claimant had sustained no permanent disability as the result of the heat exhaustion that he suffered in July, 1954. But appellant contends that, since the doctor based his opinion partly on the notes of the examination of October 9, 1954, which notes were made by others, his evidence was therefore based on hearsay and, for that reason, was not such competent and substantial evidence as would support an award. It appears that no objection was made to the consideration of this testimony, or any motion made to strike it from the record, after it was developed on cross-examination that the doctor was testifying from records made by others. The evidence, therefore, should be given its natural probative effect. Nations v. Barr, Mo.App., 43 S.W.2d 858.

 The evidence was competent for still another reason. A witness, in refreshing his recollection, need not be confined to writings which he himself has made, but may be permitted to refer to another's writing or record which he himself knows to be correct. Voyles v. Columbia Terminals Co., Mo.App., 223 S.W.2d 870; Rose v. Rubeling, 24 Mo.App. 369; Taussig v. Shields, 26 Mo.App. 318; State v. Patton, 255 Mo. 245, 164 S.W. 223; American Paper Products Co. v. Morton Salt Co., Mo.App., 279 S.W.

761; Gordon & Koppel Clothing Co. v. New York Central R. Co., Mo.App., 285 S.W. 755. Dr. Parsons testified quite definitely that he did examine claimant on October 9th, and that during the examination he verified all the information disclosed by the notes written by his secretary and Dr. Swartz. It was, therefore, proper for him to use these notes to refresh his memory, and his testimony was competent substantial evidence, and sufficient to support the award.

After an examination of the record in this case we have reached the conclusion that the award of the commission is supported by competent and substantial evidence. The judgment appealed from is affirmed.

MATTHES, J., and SAM C. BLAIR, Special Judge, concur.